IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| EK VATHANA, individually and on behalf of all others similarly situated, | No. 12-15587 |
| | D.C. No. 5:09-cv-02338-RS (Northern California) |
| Plaintiff-Appellant, | |
| vs. | |
| EVERBANK a/k/a EVERBANK DIRECT a/k/a EVERBANK FEDERAL SAVINGS ASSOCIATION, EVERBANK FINANCIAL CORP, EVERBANK WORLD MARKETS, and DOES 1 to 25 | |
| Defendants-Appellees. | |

==================================================
ON APPEAL FROM THE ENTRY OF FINAL JUDGMENT
IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
HONORABLE RICHARD SEEBORG, PRESIDING
==================================================

**Reply Brief** of Plaintiff-Appellant Ek Vathana

———————————

Michael Millen
Law Offices of Michael Millen
119 Calle Marguerita #100
Los Gatos, CA  95032
(408) 871-0777  / (408) 866-7480 [fax]

## TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................... 1

**RESPONSE TO COUNTER-STATEMENT OF THE CASE** ........................... 2

*GOOD FAITH PROTECTION OF THE CUSTOMER* ....................................... 2

*SAFETY & SOUNDNESS* ................................................................................ 3

*MAILED VS. EMAILED NOTICE* ................................................................... 6

*VATHANA'S UNDERSTANDING OF THE CONVERSION RATE AND PAYMENT IN KRONA* ................................................................................... 6

**ARGUMENT** ............................................................................................. 8

   I. EVERBANK'S INTERPRETATION OF ¶2.7.1 IS UNNATURAL AND STRAINED.. 8

   II. THE CONTRACT GIVES NO HINT THAT FORCED CLOSURES UNDER ¶1.17 WILL RESULT IN CONVERSION TO U.S. DOLLARS AND SUGGESTS THE OPPOSITE................................................................................................ 12

   III. EVERBANK WAS NOT JUSTIFIED IN CLOSING THE CDS UNDER ¶1.17 ...... 13

   IV. PARAGRAPH 1.32 (*FORCE MAJEURE*) DOES NOT JUSTIFY EVERBANK'S ACTIONS ................................................................................................... 18

   V. EVERBANK'S PURPORTED TERMINATIONS NEVER TOOK EFFECT BECAUSE EVERBANK FAILED TO GIVE PROPER NOTICE UNDER THE TRUTH IN SAVINGS ACT ............................................................................................................ 21

**CONCLUSION**.......................................................................................... 23

**STATEMENT OF COMPLIANCE (FED. R. APP. P. 32 (A)(7)(C) AND NINTH CIRCUIT RULE 32-1)** ................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Skycom Corp. v. Telstar Corp.,* 813 F.2d 810 (7th Cir. 1987) ............................... 13

*Viking Realty, Inc. v. Balzebre*, 535 So. 2d 687 (Fla. Dist. Ct. App. 1988)............. 9

**Statutes**

12 U.S.C. §4303 ...................................................................................... 21

12 U.S.C. §4305(c) ................................................................................. 21

## INTRODUCTION

To prevail in this appeal, plaintiff need only prove one of his two propositions.  In regard to the first proposition (the contract did not specify a non-consensual exit conversion rate and thus U.C.C. §3-107 supplies the conversion rate), the defense's main argument is that it would be "implausible" for a big bank to allow such a consumer-friendly, statutory conversion rate to govern because, apparently, the consumer might actually be protected against heavy-handed, unilateral bank action.  While the bank's sorrow at leaving the widow with her mite[1] is understandable, it hardly justifies inserting a new term in the contract to avoid the fairness and equity which the default U.C.C. provision provides the class members.

In regard to the second proposition (EverBank was not authorized to close CDs but instead should have renewed them), the defense's principal argument is that forcing a guaranteed loss upon customers was allowed by the terms so as to protect the bank from the risk caused by its inexplicable failure to accept krona delivery from its forward contracts.

---

[1] Gospel of Mark 12:41-44

None of the defense's arguments deter from the inescapable conclusion that EverBank breached its contract to its customers both in its use of the wrong conversion and its non-renewal of accounts.

## RESPONSE TO COUNTER-STATEMENT OF THE CASE

### *Good Faith Protection of the Customer*

EverBank claims that it non-renewed and closed out the CDs in order to protect customers. However, class member Robert Hodges (ER244) and Ek Vathana (ER185, ¶6) specifically communicated to EverBank that they did not want this to happen. A bank cannot in good faith believe that closing an account and locking in a loss will protect the customer when the customer asks the bank to so refrain. Regardless, this is a triable issue of fact which should be submitted to a jury.

More to the point, defendants' act of converting plaintiff's krona into dollars actually **caused** a loss which otherwise did not exist at the time. The defense muses that "If the exchange market for króna never returned, Plaintiffs would have received no value in dollars for the proceeds of their CDs, leaving them with no return on their investment." (Appellees Brief at 31). However, there is no evidence that that those who purchased these CDs expected or wanted to

receive anything back other than Icelandic krona.  As the facts indicate, the CDs

themselves promised Icelandic kronas.  Regardless of whether other currencies

(such as the U.S. dollar) went up or down, customer would, by definition,

experience no loss as long as they were paid all of their krona. A party who

bargains to receive something has lost nothing when he receives what he has

bargained for even if the market thinks less of it.  Thus, in no sense could

EverBank's argue that it was reasonably trying to prevent WorldCurrency

customers from suffering a loss.  This is particularly true for class members like

Ek Vathana who specifically informed EverBank that they did not want their

krona credits converted into dollar credits on the banks books.


### Safety & Soundness

No less than nine times in its brief, EverBank justifies its actions based

upon its internal "safety and soundness" policies[2].  While the irrelevancy of these

secret internal policies will be thoroughly argued *infra*, the irrationality of the

---

[2] EverBank explains that these polices include:  (1) EverBank could not hold
more than $350,000 in a foreign currency unless the bank's Assets and
Liabilities Committee liked the idea (ER635-636, ¶ 17); (2) EverBank does
not want its employees to travel with a large amount of currency (ER636-637,
¶25); and (3) EverBank should not be "overleveraged" in Icelandic krona
(ER569, ¶46).

policies was the subject of testimony.  As foreign currency trading expert Bjarni Kristjansson testified, it makes no sense for a bank with a foreign-currency liability to forbid itself from obtaining the "very currency needed to offset the liability because such a rule would prevent it from properly hedging the risk." (ER1217-18, ¶4).  Mr. Kristjansson explained this in an analogy: if a bank promises to pay a group of depositors 1,000 ounces of gold, it would not make sense for the bank to create a rule which prevents itself (or someone on its behalf) from holding more than 10 ounces of gold. The same would be true for Icelandic krona.  (*Id*.)

Indeed, EverBank's vice president Frank Trotter testified inconsistently on this issue.  In his October 2011 declaration, Trotter stated that "If EverBank had simply held the proceeds of each customer's WorldCurrency CDs maturing between October 8, 2008 and December 31, 2008 in Icelandic Krona without a corresponding forward contract to hedge the risk of currency fluctuations, EverBank would have been significantly overleveraged in Icelandic Krona." (ER637, ¶30).  However, at his deposition he agreed that having an intermediary hold krona on EverBank's behalf was an acceptable way to hedge EverBank's liability to pay a customer krona (ER1095-98) even though he never recalled a time of an intermediary actually doing so.  (ER1101).  In fact, EverBank never had

an account in which it could take delivery (ER1103) and it was not until the very end of 2008 that EverBank internal emails show a real interest in opening up a bank account at an Icelandic bank.  On Dec. 24, 2008, Jennifer McLean informed Mr. Trotter that one of EverBank's intermediaries was "happy to wire the ISK" to EverBank's Icelandic bank account but that she had "no idea how long that would take to get the account opened." (ER1206).  On Dec. 31, 2008, Chuck Butler confessed to Mr. Trotter that he didn't even know whether the treasurer's approval was need to open such an account. (ER1211).

EverBank's concern about having a large krona liability to its CD customers without a corresponding krona hedge was undoubtedly real.  However, EverBank's failure to do the obvious – accept delivery and thus have zero risk – is a corporate flub which cannot be pawned off on customers.  EverBank never inquired about opening up a bank account to receive the krona from its forwarding contracts until the last few days of December 2008, but even worse forbade itself from taking delivery of more than $300,000 in krona –the very krona which it could then use to satisfy all outstanding WorldCurrency CD liabilities.

The district court discusses EverBank's contentions in this regard (ER18) but does not mention or analyze any of these counter-points.

*Mailed vs. Emailed Notice*

The lower court found that "there appears to be some question as to whether EverBank provided investors with effective notice of its decision to liquidate the CDs via informal emails prior to doing so". (ER21). This finding was presumably based upon the testimony of customers Ek Vathana (ER966) and Thomas Brandt (ER954-955) who stated that official communication about CDs were in writing sent via U.S. mail. In contrast, EverBank points out its testimony that "we communicate with our customers primarily through the email address that each customer designates to us". Deciding whether EverBank's notice was "reasonable" (as that phrase is used in ¶1.17) is a fact intensive question, and a summary judgment motion is the wrong place to answer it.

*Vathana's Understanding of the Conversion Rate*
*and Payment In Krona*

Defendants suggest that plaintiff acknowledged at his deposition that ¶2.7.1 governed "the rate that everyone used to convert their currency." (Appellees Brief, p. 22). However, the cited colloquy was about plaintiff *opening* his account and had nothing to do with a conversion rate when he *exited* the account. (ER425:18-24).

Defendants also argue that the "EverBank Guide to Currency Investing" bears upon this dispute. No evidence has been presented that this document modifies or supplements the contract between the parties. Indeed, the Terms and Conditions make clear that it is the Agreement (and not supplementary sales material) which governs all EverBank accounts. (ER303 at ¶1 ( "1. EverBank Accounts and Services: This Agreement governs your EverBank accounts . . . ."))

Even if the Guide is some sort of amendment, the document strongly suggests that the customer is in complete control of choosing whether to convert and what conversion rate to use. Thus, the Guide states that "you may *convert your currency elsewhere* and fund your preferred EverBank account with the appropriate foreign currency." (ER438, right hand column) (emphasis added). The Guide also states "You may receive withdrawals in *either* the foreign currency or in U.S dollars" and that "[w]ithdrawals can be made in *either* U.S .dollars or the foreign currency specific to your account." (ER439, left hand column) (emphasis added). The document also talks about a currency conversion fee "if you *choose* U.S . dollars". (ER439, left hand column) (emphasis added). The clear implication of the Guide is that it is the customer, and not EverBank, who chooses whether to convert a foreign currency deposit to U.S. dollars or keep it as a foreign currency.

Even EverBank's opposition points out that "EverBank will make its best efforts to obtain negotiable consideration on your behalf". (Appellees Brief at 24). This means that EverBank is committed to giving depositors their foreign currency. As will be discussed below, the problem is that EverBank did not make "best efforts" to receive its corporate kronas and give them to customers but instead sold its krona and then complained that it had no krona with which to pay customers and that this would result in an unhedged transaction.

## ARGUMENT

### I. EVERBANK'S INTERPRETATION OF ¶2.7.1 IS UNNATURAL AND STRAINED

The defense argues that the third sentence of ¶2.7.1 provides a non-consensual exit conversion rate because, taken in isolation, it neither mentions entry nor exit conversions and is therefore universal. However, divorcing the third sentence of ¶2.7.1 from its contextual underpinnings found in the previous two sentences leads to an unnatural and strained reading of the provision.

The first sentence of ¶2.7.1 sets the tone of the entire paragraph: "This account will be used to hold funds denominated in a currency other than U.S. dollars." Under traditional rules of grammar, this first sentence sets the overall

topic for the paragraph, to wit: the holding (and perhaps populating) of the account in a foreign currency.

The second sentence of ¶2.7.1 continues with this theme: " If you request funds in this account to be denominated in a currency other than the currency sent to us to fund the account, we will convert your funds using a then current conversion rate set by us."  This sentence introduces the subtopic of how this foreign-currency-only account can be populated with a foreign currency if U.S. dollars (or some other mismatched currency) is sent to EverBank to fund the account.  The point to note is that this second sentence leaves the reader asking a very natural question: "What is the conversion rate EverBank will use to turn my dollars into the foreign currency this account is supposed to hold?"

It is here that the third sentence of ¶2.7.1 comes into play, stating: "Your currency conversion rate will be within 1% of the wholesale spot price we pay for your currency."  EverBank urges the court to take this sentence and treat it as if it simply stands alone, because, "Nothing in the description of the currency conversion rate in the third sentence is dependent on or limited by the preceding sentence."  (Appellees Brief at 51).  However, EverBank's argument essentially means that context is irrelevant – a strange argument to make given EverBank's citation to the *Viking Realty* case which says that "when interpreting a contract, it

must be done 'in its entirety and not clause by clause.'" (Appellees Brief at 52)

(citing to *Viking Realty, Inc. v. Balzebre*, 535 So. 2d 687 (Fla. Dist. Ct. App.

1988)).

EverBank also urges the court to adopt a *sub silentio* reading of the contract.

The idea is that EverBank and their lawyers are far too clever to allow a consumer-

friendly statutory provision like U.C.C. §3-107 to remain in play.  Therefore, the

reasoning goes,  the court should assume that an exit conversion rate for forced

conversions must be lurking in somewhere the contract.  After all,

> it is simply *unreasonable* to believe that EverBank would have
> specified the currency conversion rate that is applicable at
> account opening, identified other circumstances requiring
> conversion, and then done nothing to specify the rate that is
> applicable under those circumstances.

(Appellees Brief at 52) (emphasis added).  But this is exactly what EverBank did,

and the problem is that EverBank has it backwards: these tiny-print contracts of

adhesion are liberally construed in favor consumers to the detriment of big banks,

not the other way around.  While EverBank is correct that "this Court cannot re-

write the Terms and Conditions" (*id.*), using the default statutory rate would not

do so.  It is EverBank which asks the court to find that which is not there, and no

fair reading of the contract would lead one to believe that ¶2.7.1 unambiguously

provides for an exit conversion rate, and particularly an exit conversion rate for situations where the bank forcibly closes the account under ¶1.17 or ¶1.32.

EverBank also wrongly argues that the declaration of plaintiff's language expert was inadmissible because the expert was not formally disclosed, the declaration was submitted in a reply, and the matter is not the proper subject of expert testimony. Each of these objections is easily dealt with.

First, plaintiffs had no duty to disclose the expert prior to the summary judgment motion because the district court never set a scheduling order or trial date. Experts do not need to be disclosed before the expert disclosure date, and the defense cites no authority suggesting that a party moving for summary judgment must disclose an expert when there is no expert disclosure deadline in place. The defense was free to ask for a continuance and take the expert's deposition but chose not to do so.

In terms of the timing of the expert linguist declaration, EverBank appears to have misremembered the timing of the motions. On Nov. 22, 2010, EverBank filed a cross-motion for summary judgment along with its opposition to plaintiff's summary judgment motion. (ER386). On Dec. 16, 2010, plaintiff submitted the expert declaration (ER492) as part of his opposition to EverBank's cross-motion. On Dec. 23, 2010, the defense filed a reply in support of their cross-motion which

thoroughly discussed the expert declaration. (ER510; ER520-522). Thus, there was no unfairness of any kind.

Finally, EverBank appears to have missed the thrust of plaintiff's argument about the admissibility of expert linguistic testimony. While it is the job of the court to interpret a contract, it is the job of the parties to submit to the court relevant information on principles of grammar (such as syntax, semantics, pragmatics, and structure) and the meaning of English words. Plaintiff's linguist did just that.

Thus, the lower court should have considered the linguists declaration to the extent it explained normal rules of grammar, syntax, and style.

## II. THE CONTRACT GIVES NO HINT THAT FORCED CLOSURES UNDER ¶1.17 WILL RESULT IN CONVERSION TO U.S. DOLLARS AND SUGGESTS THE OPPOSITE

As noted *supra*, pp. 6-7, EverBank's contract leads the customer to believe that money will never be converted out of a foreign currency unless and until the customer chooses to do so. Nothing in ¶2.7.1 or ¶1.17 ever hints that a customer will be forced to convert their foreign currency if they do not wish to do so. Thus, even if EverBank was right that somehow ¶2.7.1 could be read to apply to krona-to-dollar conversion, EverBank still has not shown that the rate applied to non-consensual conversions.

## III. EverBank Was Not Justified in Closing the CDS Under ¶1.17

Plaintiff laid out several reasons why EverBank was not justified in closing the CD's under ¶1.17, none of which have been effectively countered by EverBank.

Plaintiff's first argument (Opening Brief at 50) was that EverBank could not reasonably believe that closing the account would limit customer losses. EverBank argues that because converting krona to dollar could result in additional customer losses were a possibility under the circumstances, it was justified in non-renewing the CDs. However, this misses the point: each day in the foreign exchange market, there is always the possibility that a customer's foreign currency may go up or down in value relative to the U.S. dollar, and EverBank has admitted that it could not predict which way the market would go. Under EverBank's logic, EverBank is always free to close WorldCurrency CDs at any time because the next day could bring a loss. This unbridled discretion is simply out of the spirit of the contract and is certainly different than the philosophy that Frank Trotter stated on multiple occasions, namely, that customers make their own choices. (See Opening Brief at 51).

In addition, and as pointed out above, WorldCurrency investors who bargained to receive krona would, by definition, experience no loss if they

received their krona.  The fact that other things (such as U.S. dollars) were going up or down in value is irrelevant as the customer did not bargain to receive those things.

Plaintiff's second argument (Opening Brief at 53) was that EverBank is estopped from claiming the benefits of ¶1.17 in terms of preventing loss to itself because  (a) EverBank imprudently took no steps to prepare for alternate hedging strategies when it knew of Iceland's precarious financial situation in in the spring of 2008, and (b) it never took delivery of krona which would have perfectly hedged its liability.  (Opening Brief at 53-54).  Although EverBank never mentions this estoppel argument anywhere in its brief, it states in a footnote that "[n]o expert testimony was required to explain why, at a time when the króna's value was tumbling, EverBank chose not to acquire and hold significant quantities of króna in contravention of safety and soundness policies".  (Appellees Brief at 36, n.12).  But such testimony is absolutely required if EverBank is to overcome plaintiff's evidenced estoppel argument, namely, that EverBank *secretly* (ER1220) set up hedging policies which were *irrational* (ER1217-18, ¶4) which EverBank used to justify non-renewing CDs.  Put simply, EverBank cannot claim that it was reasonably entitled to close accounts to the detriment of customers in order to eliminate its own speculative risk when that risk was caused by EverBank's failure

to accept delivery of that which it owed customers. Given that class members had no idea that EverBank was engaging in risky foreign market trading (ER1220; ER1223), EverBank can hardly suggest that its trading troubles justify selling out class members' investments at a bad time when no reasonable class member could have ever read the contract to understand that was EverBank's intention or right.

In addition, the evidence in the case shows that the Icelandic crisis was having no discernible effect on EverBank's ability to deliver krona to its customers. Thus, prior to the crisis, EverBank was promising to deliver krona to the customers and was hedging this promise by buying a forward contract specifying delivery of krona at the end of the term. The Icelandic crisis may have made it difficult to buy those forward contracts for the price EverBank wanted to pay, but there was never any trouble in simply buying the krona itself. (ER231, ¶12; ER238, ¶4). Thus, EverBank could not suffer a loss if it would simply pay its customers in the krona which the CD specified; rather, it could only suffer a loss if it insisted on engaging in buying and selling speculative foreign currency forward contracts. Misplaced corporate hedging strategies do not qualify as a good faith effort to limit losses in the face of the extreme loss which forced conversion wreaked upon the class.

Plaintiff's third argument (Opening Brief at 55) is that there was no sense of immediacy which would trigger the ¶1.17 "no notice" provision because EverBank spent months closing out the accounts. EverBank admits that the process took "months" and that situation was only "most urgent with the accounts set to mature imminently". (Appellees Brief at 32, n.8) EverBank's frank admission that "accounts with a longer time horizon allowed EverBank to take more time to search for a better exchange rate or forward currency contract" (*id.*) makes it impossible to find that the account closures were done with the sense of "immediacy" required by the "no notice" provision in ¶1.17.

Plaintiff's fourth argument (Opening Brief at 55) was that the spirit of ¶1.17 did not allow EverBank to protect itself from loss if doing so would cause a loss to the client. In response, EverBank essentially argues that nothing in the contract prevented it from limiting its own losses by converting plaintiff's krona credit into dollars in a panicked market. While it is true that the contract is silent concerning the point, that hardly ends the discussion. As noted above, the CDs were denominated in krona. Once the CDs were converted into dollars, plaintiffs no longer had krona nor did they have enough dollars to purchase an equivalent amount of krona at an Icelandic bank. If the point of ¶1.17 is to limit loss to either party, then EverBank can hardly claim it was doing so if the only way limit its loss

(or risk of loss, to be more exact) was to cause a loss to its depositor.  Thus, the court should find that EverBank did not unambiguously have the right to cause a loss to depositor to protect its corporate risk profile.

Plaintiff's fifth argument was that ¶1.17 could not co-exist with the promise of renewability in ¶2.7.10 because there were no limitations or contingencies present on ¶1.17.  EverBank argues that ¶1.17 only applies in a "particular, more specific situation i.e., when EverBank reasonably believes immediate closure is necessary to limit losses." (Appellees Brief at 38).  However, EverBank has made clear that ¶1.17 gives EverBank the right to close an account *anytime* there is the possibility that the market may go down.  In fact, EverBank cannot present a scenario in which ¶1.17 *would not apply* since the possibility of loss always exists to one degree or another.  Thus, the two provisions stand in contradiction to each other: ¶2.7.10 promises renewability, and ¶1.17 gives EverBank the right to non-renew anytime it wants because markets could always go down.  Such a contradiction makes the contract ambiguous and not only precludes summary judgment for the defense but mandates it for plaintiff as such ambiguities are to be construed in favor of the consumer.

The defense also argues that it gave reasonable notice to plaintiffs of the closure of their account under ¶1.17. (Appellees Brief at 47).  However, and as

noted in the facts above, the parties submitted conflicting evidence as to whether EverBank's primary mode of communication for official notices was via paper (ER954-955; ER966) or via electronic mail (ER606). Even the lower court found that the matter was questionable (ER21) and thus summary judgment for the bank cannot be granted on that portion. However, if the Truth in Savings Act (TISA) applies, then summary judgment can be granted to plaintiff on the point because the bank admits that it only gave notice of the closures via email and not U.S. mail as per TISA.

## IV. PARAGRAPH 1.32 (*FORCE MAJEURE*) DOES NOT JUSTIFY EVERBANK'S ACTIONS

EverBank contends that the Icelandic crisis triggered its rights under ¶1.32 (Force Majeure) to close the CDs and convert them to U.S. dollars because the crisis "impaired its ability to renew CDs denominated in Icelandic króna."[3] (Appellees Brief at 45). However, the trigger in ¶1.32 for closing (or converting) a customer's account is the existence of a government restriction and/or any other cause beyond the reasonable control of EverBank which makes closure (or conversion) "*necessary*". (¶1.32)

---

[3] Given that a CD is simply a credit on the bank's books, it is not clear how anything could literally impair the simple act of changing the due date.

It is on this "necessary" prong that EverBank's analysis goes astray. The problem, according to EverBank, is that "EverBank could not issue króna-denominated CDs *in a manner that complied with its safety and soundness policies*." (Appellees Brief at 46) (emphasis added). These self-imposed policies relate to the risk and return which EverBank receives on its corporate foreign currency hedging investments – investments which EverBank's customers do not even know exist. (ER1220; ER1223).

In other words, EverBank contends that its internal policies relating to corporate foreign currency hedging investments which (a) are never mentioned anywhere in the agreement, (b) can be changed at EverBank's whim (ER1146), and (c) are partly irrational (ER1217-1218), can nevertheless serve as the "necessary" fulcrum upon which the heavy hand of EverBank can jettison its promise to automatically renew a CD under ¶2.7.10.

But an objective reading of ¶1.32 indicates that the word "necessary" is supposed to relate a EverBank's *ability* to perform, not its *desire*. In this case, EverBank's performance simply consisted of renewing a promise. The vagaries and market forces affecting the krona foreign currency exchange market in no way affected EverBank's ability to renew its promise to its customers, and no reasonable bank in EverBank's position could have ever believed so.

EverBank wants this court to find that the contract is governed by EverBank's *subjective* intent that safety and soundness guidelines were an integral part of the agreement and that meeting those guidelines was a necessary predicate to all of EverBank's promises under the contract. However, subjective intent does not govern a contract. As the court in *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 814-815 (7th Cir. 1987) eloquently put it:

> "[I]ntent" does not invite a tour through [a party's] cranium, with [that party] as the guide. . . . Secret hopes and wishes count for nothing. The status of ... a contract depends on what the parties express to each other and to the world, not on what they keep to themselves. It is therefore unimportant whether [one party] expected this letter to be the definitive agreement; the binding force of the document depends on public or shared expressions....
>
> The objective approach is an essential ingredient to allowing the parties jointly to control the effect of their [agreement]. If unilateral or secret intents could bind, parties would become wary. . ... A rule of law that could ... inject the random element of a jury's determination about subjective intent [ ] would make transactions riskier.

Such is the case here. Class members like Ek Vathana and Thomas Brandt had no idea that their krona credit on EverBank's books could be sold if EverBank felt nervous about its foreign currency investments, and such a provision should not be read into the agreement.

No reasonable bank in EverBank's position could think that the removal of three Icelandic banks from the foreign currency exchange market would somehow so impact its ability to renew or roll-over pre-existing customer krona delivery commitments that cancellation would be "necessary". This is particularly true given the buying and selling which EverBank was able to accomplish on the open market.[4] The court should find that the "necessary" predicate to ¶1.32 never occurred.

### V. EVERBANK'S PURPORTED TERMINATIONS NEVER TOOK EFFECT BECAUSE EVERBANK FAILED TO GIVE PROPER NOTICE UNDER THE TRUTH IN SAVINGS ACT

EverBank argues that because the Terms and Conditions gave it the right to change an automatically renewable CD to a non-renewable CD, it did not have to follow TISA's mandatory 30 notice terms concerning CD renewability changes. EverBank goes so far as to suggest that "TISA does not apply to 'renewal policies' writ large". (Appellees Brief at 41). However, TISA says just the opposite,

---

[4] EverBank admits that "[s]tarting with CDs maturing on November 5, 2008, EverBank was able to find additional, but very limited, trading partners to exchange the proceeds of CDs from króna to United States dollars". (Appellees Brief at 18).

mandating that any change (e.g., CD non-renewability) to a "term or condition" which was required to be disclosed initially (e.g., CD automatic renewability) does not take effect unless and until notice of that change is provided in writing 30 days before the effective date. 12 U.S.C. §4305(c).

EverBank argues that "[t]he Terms and Conditions disclosed what could happen at maturity, and none of those provisions of the Terms and Conditions changed." (Appellees Brief at 41). However, once EverBank changed the automatic renewability of the CD under ¶2.7.10 to non-renewability, it changed "renewal policies for time accounts" which is a mandatory disclosure item. 12 U.S.C. §4303(d).

EverBank also misses the point about plaintiff's ability to invoke TISA. Plaintiff is not claiming that EverBank's non-compliance with TISA serves as a breach of a contract. Rather, plaintiff is simply claiming that EverBank's amendments do not take effect until 30 days after notice is mailed because EverBank's contract states that "[t]his Account Agreement is subject to applicable federal laws". (ER302). EverBank may not claim that a CD renewal term has changed unless and until it has given 30 days' notice under TISA.

The court is asked to find that automatic renewal provision of ¶2.7.10 remains in effect and that customers retain their original krona credits.

Page 22

## CONCLUSION

The trial court's order granting summary judgment to EverBank should be reversed, and the lower court should be directed to grant plaintiff's motion for summary judgment.  In addition, the court is asked to approve the precise damage calculations set forth for lead plaintiff Ek Vathana (as modified for interest according to the date) and direct the lower court to calculate damages for all other class members using lead plaintiff Ek Vathana's calculation as an exemplar or template.

## STATEMENT OF COMPLIANCE
### (Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1)

This brief is proportionately spaced, has a typeface of 14 points or more and contains 4,888 words.

Respectfully Submitted,

Dated:  November 9, 2012          By:_____

MICHAEL MILLEN
ATTORNEY FOR APPELLANT

Certificate of Service

The undersigned hereby certifies that he is a member in good standing of the bar of this court, not a party to this action, and is employed at 119 Calle Marguerita #100, Los Gatos, CA  95032.  I served the following documents in the manner specified below.

The foregoing **Reply Brief of Plaintiff-Appellant Ek Vathana** was filed and served on November 9, 2012, via the court's ECF system.


I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.


Dated:  November 9, 2012        By:_____

                                                 MICHAEL MILLEN